IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARTIN C. MR. ABELL, #311-293,               *

Plaintiff,                                   *

v.                                           *            Civil No. WDQ-13-2065

SHARON BAUCOM, M.D.                          *
JANICE GILMORE[1]
WEXFORD HEALTH SOURCES, INC.                 *
MONICA METHENY, R.N.
COLIN OTTEY, M.D.                            *
GREG FLURY, P.A.
DAWN HAWK, R.N.                              *
CHRISTINE BUTLER,
                                             *
Defendants.
                                          ***
                          MEMORANDUM OPINION

        On July 17, 2013, Mr. Martin C. Abell, a Maryland Division of Correction ("DOC")

prisoner confined at Western Correctional Institution ("WCI"), filed a self-represented civil

rights action pursuant to 42 U.S.C. § 1983,[2] seeking money damages and injunctive relief

mandating he receive open heart surgery, eye surgery, a walking cane, and front handcuff

placement.  Specifically, Mr. Abell claims that Correctional Defendant Dr. Sharon Baucom,

"acted in concert with [other Medical Defendants] to prolong and deprive [him] of open heart

---

[1] The Clerk shall amend the docket to reflect Defendants' proper names and titles and to reflect Mr. Abell's August 9, 2013 transfer from North Branch Correctional Institution ("NBCI") to Western Correctional Institution.  *See* ECF 15-2 at 3.

[2] Under § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (2012).

surgery. . . ." and knew that he had cataracts, but "fail[ed] to take appropriate action."  ECF No.

1 at 7-8, 14-15.  He further claims that employees of Wexford Health Sources, Inc. ("Wexford")

(hereinafter, the "Medical Defendants") failed to provide open heart surgery to remove arterial

blockage, denied him cataract surgery, and failed to process orders for a cane and front cuffing.

*Id.*  Mr. Abell also claims generally that Defendant Ms. Dawn Hawk, R.N., failed to provide

medication.  *Id.*  at 10-12.

Mr. Abell fails to state when these alleged constitutional violations occurred.  The Court

concurs with the Medical Defendants that, given the date Mr. Abell filed his Complaint and the

location of the named Medical Defendants, the Complaint concerns the medical care he received

while incarcerated at North Branch Correctional Institution ("NBCI").  *See generally* ECF

No.17-1.  Wexford became the DOC's contractual health care provider on July 1, 2012,[3] and Mr.

Abell was transferred from NBCI on August 9, 2013.  *See* ECF 15-2 at 3.

Pending are Dr. Baucom's and the Medical Defendants' unopposed[4] motions to dismiss,

or, in the alternative, for summary judgment.[5]  *See* ECF Nos. 15, 17.[6]  No hearing is necessary.

*See* Local Rule 105.6 (D. Md. 2014).

---

[3] Prior to July 1, 2012, Wexford, working under contract with Maryland's Department of Public Safety and Correctional Services, provided onsite utilization review management services to arrange offsite medical and clinical services to Maryland prisoners.  *See* ECF Nos. 17-1 at 2, 17-5 at 2.

[4] The record shows that Abell was served with notice of Defendants' filings pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).  *See* ECF Nos. 16, 18.  Mr. Abell failed to notify the Clerk of his new address, and the notices were sent to his prior place of confinement.  Nonetheless, as the notices were not returned to the Clerk, it is assumed that the notices were forwarded to Mr. Abell by the NBCI mailroom to WCI.  In any event, following his transfer to WCI, Mr. Abell requested and received additional time to respond to the dispositive motions.  *See* ECF Nos. 20, 21.  He has chosen not to respond.

[5] As discussed further herein, the dispositive submissions will be treated as motions for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the four corners of the document have been considered.  *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[6] The Medical Defendants also move to seal their dispositive motion on the basis that relevant medical records attached as exhibits thereto contain Mr. Abell's personal information. ECF No. 22.  Mr. Abell, however, has not requested sealing of the information.  To the extent that the motion and exhibits contain personal information,

I.    Background[7]

Mr. Abell, who is in his early sixties, alleges that he has not received adequate cardiac and eye care. ECF No. 1 at 5-8. He suffers from coronary artery disease, hypertension, uncontrolled Type II diabetes mellitus with neurologic manifestations, hyperlipidemia, and psoriasis. ECF Nos. 17-4, 17-5 at 3. His uncontroverted health care history as provided by Wexford employees between July 1, 2012, and the filing of the dispositive motions, follows.

On July 24, 2012, Mr. Abell was seen by Defendant Dr. Colin Ottey at the prison chronic care clinic, where he reported that his chest pain had improved and he had lost significant weight. See ECF No. 17-4 at 2. Dr. Ottey's cardiovascular exam showed regular rhythm, no murmurs, gallops, or rubs, and a normal heart rate. *Id.* at 2-4.

On July 29, 2012, Mr. Abell was seen by Dr. Ottey regarding non-compliance with his medication. Id. at 6. Mr. Abell indicated that he has not been taking his Levemir for diabetes and reported nausea, hot flashes, diaphoresis, chest pain, shortness of breath, and rhinorrhea. Id. Mr. Abell was in no apparent distress when examined, and his heart showed a regular rhythm without murmurs, gallops, or rubs. *Id.* at 6-8.

On August 1, 2012, Mr. Abell was seen by Dr. Ottey for his diabetes, where he complained of blurred vision, increased fatigue, dyspnea (shortness of breath), weight loss, burning extremities, and heartburn. *Id.* at 9. Mr. Abell was in no apparent distress, however; his cardiovascular exam was normal, and his medications were continued. *Id.* at 9-12.

On August 17, 2012, Mr. Abell was seen by Dr. Ottey for complaints of left-sided chest pain that radiated to the neck and left arm. *Id.* at 13. Mr. Abell was dizzy, short of breath, and

---

Defendants are directed to file redacted versions of those documents, along with a renewed motion seeking to seal the unredacted versions. The Motion to Seal currently before the Court will be denied.

[7] In reviewing the motion for summary judgment, Mr. Abell's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

nauseous. *Id.* He stated that he had taken five aspirin and two nitroglycerin tablets. *Id.* Dr.

Ottey ordered an electrocardiogram ("EKG") and troponin test and sent Mr. Abell to the

Western Maryland Health System Hospital Emergency Room. *Id.* at 13-15. The EKG and

troponin test showed negative results. *Id.* at 16. Mr. Abell was admitted to the hospital for

observation. *Id.* at 19-54. A chest x-ray revealed elevation of the left diaphragm and his heart

was at the upper limits of normal to minimally enlarged. *Id.* at 31. Previous coronary bypass

surgical changes were noted. *Id.* at 33. Mr. Abell was discharged the next day after an acute

myocardial infarction (heart attack) was ruled out and he was diagnosed with

gastroesophageal reflux disease ("GERD") and stable angina. *Id.* at 44, 50-53. Mr. Abell was

to continue his current medications and add Omeprazole for his stomach, Pravastatin for his

cholesterol, and Imdur for chest pain. *Id.* at 44-49. It was recommended that a stress test be

performed. *Id.* at 44.

Mr. Abell was admitted to the prison infirmary for observation and reported no chest

pain or shortness of breath. *Id.* at 55. He was seen by Dr. Ottey on August 19, 2012, and

discharged back to his unit. *Id.* at 56-60.

On August 25, 2012, Mr. Abell was seen by Dr. Ottey for follow-up, where he reported

the chest pain had improved but that he had episodes of fluttering, shortness of breath, and

dizziness if he stood up quickly. *Id.* at 62. Mr. Abell's medications were continued and a

consult request for a stress test was submitted. *Id.* The stress test was approved on August 28,

2012. *Id.* at 62-67.

On September 6, 2012, Mr. Abell asked Defendant Ms. Monica Metheny, R.N., if he

could go off his 2400 calorie diet. *Id.* at 68. Refusal forms were to be sent to him. *Id.* at 68-69.

On September 8, 2012, Mr. Abell was seen by Dr. Ottey for complaints of left and center

4

chest pain and dizziness. *Id.* at 70. Mr. Abell was admitted to the infirmary, an EKG and troponin test were ordered, and his 2400 calorie diet was reordered. *Id.* at 72. The EKG was within normal limits. *Id.* at 73. During nursing rounds, Mr. Abell indicated his chest pain was due to mace residue on the wall of his unit. *Id.* at 74.

Mr. Abell was seen by Dr. Ottey on September 9, 2012. *Id.* at 76. It was noted that the troponin test was negative and a stress test was pending. *Id.* A cardiology consult was submitted. *Id.* at 80. Mr. Abell was discharged by Dr. Ottey. *Id.* at 76. On September 20, 2012, Mr. Abell's chart was updated to reflect the February 9, 2012 approval for use of a cane for ambulation and front hand-cuffing for one year. *Id.* at 88-89.

On September 24, 2012, Mr. Abell was seen at Bon Secours Hospital ("BSH") by Dr. Athol Morgan for a cardiology evaluation. *Id.* at 82. Mr. Abell reported that in 2000, he received coronary artery by-pass surgery at Washington Hospital Center after an initial attempt at minimally invasive surgery via a left thoracotomy failed. *Id.* Mr. Abell denied ankle edema swelling, indicated he had been a heavy smoker, and that his mother had coronary artery disease. *Id.* Dr. Morgan noted Mr. Abell's poor dentition and recommended an echocardiogram that day to be followed by a stress test. *Id.* at 83. Dr. Morgan noted that Mr. Abell got along reasonably well with on-site medical management and should continue with it, but deferred to DOC physicians for Mr. Abell's cholesterol medication. *Id.* Dr. Morgan also recommended a follow up after non-invasive testing was completed. *Id.* at 84.

On October 7, 2012, Dr. Ottey updated Mr. Abell's chart and submitted a consult request for a stress test and cardiac evaluation. *Id.* at 90-92. On October 10, 2012, Mr. Abell was seen by Dr. Ottey to review the cardiology consult and was told the request for a stress test was approved. *Id.* at 96. Mr. Abell had no complaints of chest pain and was in no apparent

5

distress. *Id.* Dr. Ottey prescribed Zocor (a different statin) and Bactrim DS (an antibiotic). *Id.* at 96-98.

On October 26, 2012, Mr. Abell was seen by Defendant Mr. Greg Flury, P.A., to discuss the status of the stress test that had been requested, but not yet scheduled. *Id.* at 99. Mr. Abell stated he had no exacerbation of chest pain or other pulmonary symptoms in the last three weeks. *Id.* at 101.

On November 2, 2012, Mr. Abell went to BSH for a stress test. *Id.* at 104. On November 11, 2012, Mr. Abell was seen by Dr. Ottey to discuss the stress test results, which revealed a large scar in the area of the LAD distribution with mild depression of global function.[8] *Id.* at 105. Mr. Abell was prescribed Prilosec to treat his GERD symptoms. *Id.* at 107. On November 13, 2012, Mr. Abell's cardiology consult was put on hold pending further evaluation. *Id.* at 108.

On November 15, 2012, Mr. Abell's left eye cataract was evaluated by Dr. Summerfield, an ophthalmologist. *Id.* at 109. Mr. Abell had 20/70 vision in that eye. *Id.*

On November 27, 2012, Mr. Abell was seen by Ms. Autumn Durst, R.N., with complaints of chest pain. *Id.* at 110. Mr. Abell claimed he had been having dull, burning pain and arm numbness for approximately eight hours and had taken two nitroglycerin pills without relief. *Id.* The EKG was abnormal, but Mr. Abell's heart rate was regular and his troponin test was negative. *Id.* at 111. Mr. Abell was given more nitroglycerin but his pain persisted. *Id.* Dr. Ottey ordered Mr. Abell admitted to the infirmary. *Id.* Upon admission, Mr. Abell complained of intermittent left arm pain for three days, nausea without vomiting, and occasional shortness of breath. *Id.* at 113. He was evaluated by Dr. Renato Espina later that morning. *Id.* at 114. He had no cough or audible wheeze, his respirations were regular, he

---

[8] Mr. Abell had a slightly reduced ejection fraction. *See* ECF No. 17-4 at 105.

had no chest pain or palpitations, and his heart rhythm was regular. *Id.* The EKG revealed an old anterior wall myocardial infarction. *Id.* Mr. Abell was prescribed lsordil. *Id.* at 115. During skilled care rounds in the infirmary, Mr. Abell reported crushing chest pain and shortness of breath. *Id.* at 116. On November 28, 2012, Mr. Abell told Dr. Espina his pain had improved, and he was later discharged. *Id.* at 119-121.

On November 29, 2012, Mr. Abell was seen by Ms. Hawk for complaints of chest pain. *Id.* at 122. His speech was loud and clear and he spoke for long periods of time without shortness of breath. *Id.* Dr. Ottey ordered Mr. Abell admitted to the prison infirmary for 23 hours evaluation. *Id.* On November 30, 2012, Mr. Abell arrived at the infirmary by wheelchair. *Id.* at 124. He denied respiratory complaints or chest pain, and described only heaviness; no swelling was noted. *Id.* Mr. Abell complained that every time he got his insulin and went to eat, he experienced chest pain. *Id.* at 125. He denied eating that night and later vomited. *Id.* During skilled care rounds, Mr. Abell stated he had not had a bowel movement in two weeks, but that was normal for him, as he only had one bowel movement per month. *Id.* at 126. Mr. Abell was evaluated by Mr. Flury the next day and complained that his symptoms were recurring. *Id.* at 127-28. He was prescribed Gaviscon for heartburn, acid indigestion, and sour stomach. *Id.* at 129.

During skilled care rounds Mr. Abell again complained his chest pain worsened when he ate. *Id.* at 130. He was given a bowel aid and encouraged to drink more fluids. *Id.* Dr. Ava Joubert evaluated Mr. Abell on December 1, 2012, as having atypical chest discomfort likely due to gastrointestinal effects. *Id.* at 131-33. After Dr. Joubert left, Mr. Abell asked that if the doctor thought he had reflux why didn't she give him something. *Id.* at

134. Mr. Abell was educated on his Prilosec and Gaviscon prescriptions, and then refused his morning dose of Prilosec. *Id.*

On December 2, 2012, Mr. Abell stated he was not feeling well and had thrown up. *Id.* at 136. He blamed the pill he took for his heart and later complained of pressure due to clogged arteries. *Id.* Mr. Abell also complained of reflux but refused his Prilosec. *Id.* Mr. Abell was later seen by Dr. Ottey and reported no headache, abdominal pain, nausea, or vomiting. *Id.* at 138. Later, he complained of chest pressure under his breast, stating, "it's the same place where my stent is." *Id.* at 141. He exhibited no grimacing, tearing, or guarding, his blood pressure was 83/44, and he refused his prescriptions. *Id.* Dr. Ottey was notified and ordered blood pressure to be rechecked in an hour. *Id.* It was within normal limits at 110/60. *Id.*

On December 3, 2012, Mr. Abell was evaluated by Dr. Espina, noting that he felt better with no complaints of shortness of breath or diaphoresis. *Id.* at 143. Dr. Espina ordered Mr. Abell discharged, but prior to discharge Mr. Abell complained of a fluttering feeling in his chest. *Id.* at 143-46. On discharge he walked independently with no symptoms of distress but stated he would be back soon. *Id.* at 146.

On December 5, 2012, Mr. Abell complained of chest pain to Ms. Durst, claiming he took two nitroglycerin pills without relief. *Id.* at 147. On examination, he had the same number of pills he had been issued. *Id.* Dr. Ottey instructed Mr. Abell to rest in his cell and advised that he would be seen by a provider the next day. *Id.* at 147-48.

On December 6, 2012, Mr. Abell was seen by Mr. Jonas Merrill, P.A., at the prison chronic care clinic for his diabetes and hypertension. *Id.* at 150. His medications were

reviewed and continued. *Id.* at 150-51. Mr. Abell's heart was regular. *Id.* A consult request was submitted for Mr. Abell to have a Holter monitor[9] for 24 hours. *Id.* at 153-56.

On December 20, 2012, Mr. Abell was seen by Dr. Joubert for a physical examination. *Id.* at 157. He reported not taking his insulin for several weeks and requested to be put on Glucophage, an oral diabetic medication. *Id.* Mr. Abell was prescribed Glucophage. *Id.* at 190.

On January 25, 2013, Mr. Abell, who then weighed 245 pounds, was seen by Ms. Susan McKenrick, R.N., and requested that he be taken off the 2400 calorie diet because he believed it made him sick. *Id.* at 192. Mr. Abell asked when he would have his cardiology consult and complained of side effects from the cholesterol medication. *Id.* Mr. Abell was referred to his provider for a medication consult. *Id.* at 193.

On January 31, 2013, Mr. Abell was seen by Mr. Flury for a medication consult and requested he be removed from the 2400 calorie diet due to weight loss. *Id.* at 194. Mr. Abell was in no apparent distress and his heart was regular. *Id.* The diet and one of his statin drugs were discontinued and blood and urinalysis labs were ordered. *Id.* at 194-95. On February 5, 2013, Mr. Abell voluntarily declined his medically prescribed 2400 calorie diet. *Id.* at 197.

On February 8, 2013, Mr. Abell submitted a sick call request for renewal of his cane for ambulation. *Id.* at 198. He was seen the next day by Ms. Hawk to request a medication change. *Id.* at 199. Mr. Abell stated he had not taken cholesterol medication in four months because he was allergic to it. *Id.* He was referred to his provider for a medication consult. *Id.* at 200.

On February 15 and 16, 2013, Mr. Abell submitted sick call requests to renew his cane for ambulation. *Id.* at 201-02. On February 20, 2013, Mr. Abell was seen by Mr. Flury to review his requests. *Id.* at 203. He reported no recent headache, chest pain, dizziness, or visual changes. *Id.* Mr. Flury was unable to identify any clear medical indication to renew the

---

[9] This machine continuously records heart rhythms during normal activity. *See* ECF No. 17-1 at 12, n.21.

cane, and noted that Mr. Abell walked unassisted with a normal, steady gait. *Id.* Mr. Abell's blood sugar level was elevated and sliding scale insulin was resumed. *Id.* Glucose monitoring twice a day for two months was ordered, as was an EKG. *Id.* at 204-06. Mr. Abell's request for a cane was disapproved. *Id.* at 206.

On February 26, 2013, Mr. Abell was seen by Ms. Kristi Cortez, R.N., complaining of leg and chest discomfort and again requested that his cane order be renewed. *Id.* at 208. On evaluation, he had no tenderness, but reported pain with movement. *Id.* Mr. Abell's range of motion and gait were within normal limits, and he had no numbness or swelling. *Id.* Heat and cold pack applications were ordered, increased fluid intake was recommended, and Mr. Abell was told to resubmit a sick call request if his symptoms did not improve. *Id.* at 209-10. On March 21, 2013, Mr. Abell was seen by Ms. Jennifer Bruno, L.P.N., for diabetes and stated he was concerned about not receiving his Isordil prescription. *Id.* at 211. Ms. Bruno checked with the pharmacy and was informed Mr. Abell had received 60 pills on March 16, 2013. *Id.* Mr. Abell's blister pack was checked and all 60 pills were there. *Id.* The medication was then put in the medication box for pharmacy staff to administer. *Id.*

On April 5, 2013, Mr. Abell was seen by Ms. Krista Swan, R.N., for medication refill because his glucose tabs had expired on March 11, 2013. *Id.* at 213. Mr. Abell's gait was noted to be steady. *Id.* He was referred for medication review. *Id.* On April 17, 2013, Mr. Abell's glucose tabs and ex-lax were renewed. *Id.*

On April 10, 2013, Mr. Abell submitted a sick call request for medical assignment of front handcuffs. *Id.* at 215. On May 15, 2013, Mr. Flury noted that Mr. Abell's paper chart was to be reviewed for this issue. *Id.*

10

On April 23, 2013, Mr. Abell was seen by Ms. Bruno in the chronic care clinic for diabetes. *Id.* at 216. He was educated on the importance of regularly testing blood sugar using finger sticks and was provided a handout on proper brushing and flossing his teeth. *Id.* Prison security told Ms. Bruno that although Mr. Abell did not read, they would have an inmate worker read the handout to him. *Id.*

On May 3, 2013, Mr. Abell submitted a sick call request to renew the order for a cane, but refused to be seen at nurse sick call regarding his request. *Id.* at 218-19. On May 9, 2013, Ms. Bruno noted Mr. Abell was refusing to leave his cell so that medical staff to check his blood sugar, but was seen by Ms. Bruno for diabetes on that day. *Id.* at 220. He stated that he needed his cane order renewed and was referred to his provider for the cane renewal. *Id.* at 220-21.

On May 15, 2013, Mr. Abell was seen by Mr. Flury for evaluation of his sick call requests for a cane, front hand-cuffs, and single cell medical assignment. *Id.* at 222. Mr. Abell stated he was previously issued a single cell due to his heart condition and inability to protect himself, but was able to walk with a normal gait using a cane and was able to climb onto the examination table unassisted. *Id.* Mr. Abell denied any recent chest pain or dizziness. *Id.* at 225.

On May 18, 2013, Mr. Abell submitted a sick call request stating he fell and hit his head while going to the toilet, which he claimed happened often. *Id.* at 228. He misstated his age as 71 and claimed he needed a medical cell. *Id.* On May 23, 2013, Mr. Flury completed a chart review and was unable to locate definitive medical necessity for Mr. Abell to benefit from single cell housing, a cane, or front cuffing. *Id.* at 229. On June 1, 2013, Mr. Abell submitted a sick call request stating that due to the deliberate indifference of Wexford medical

11

staff he continued to be deprived of his serious medical needs for a medical cell, cane, and front hand-cuffs. *Id.* at 231. It was noted that all were discontinued as unnecessary. *Id.*

On June 7, 2013, Mr. Abell submitted sick call requests complaining of diabetic leg pain, numbness in his feet, dizziness, and inability to prevent falling if not placed in front handcuffs. *Id.* at 232-33. He went to the medical unit using a cane and wearing front cuffs to request renewal of the cane and front cuff orders. *Id.* at 234. Ms. Hawk noted that the cane and front cuffs were discontinued on May 23, 2013, and informed security that Mr. Abell no longer had an order for cane and front cuffs. *Id.* Mr. Abell replied that he would see everybody in court. *Id.*

On June 11, 2013, Mr. Abell was seen by Mr. Flury. *Id.* at 235. He denied exacerbation of headache, dizziness, chest pain, or visual changes, and reported no injuries related to his alleged fall on May 18, 2013. *Id.* Mr. Abell stated his dizziness and cardiac issues continued and requested renewal of his cane order. *Id.* Mr. Abell had been seen by security outside in the recreational box for approximately one hour walking unassisted with no falls. *Id.* It was noted Mr. Abell had numerous instances of refusing checks for blood sugar and seemed to have no willingness to stick to his treatment plan. *Id.* at 236. Mr. Abell was told there was no medical indication for a cane but that his request would be considered in provider care conference. *Id.* at 237.

On June 11, 2013, Mr. Abell was seen by Ms. Bruno, who noted he was refusing his morning insulin because he did not want to be cuffed in the back. *Id.* at 239. On June 20, 2013, Mr. Abell submitted a sick call request that he continued to experience chest pain and requested to see the doctor. *Id.* at 241. On June 26, 2013, Mr. Abell was seen by Dr. Joubert at sick call. *Id.* at 242. He stated he had suffered five heart attacks in the past and had frequent

12

chest pain relieved with nitroglycerin. *Id.* Mr. Abell noted he was supposed to follow up with a cardiologist after his stress test last year. *Id.* He was in no apparent distress and had no swelling. *Id.* at 243. Mr. Abell was found to have a low-grade systolic heart murmur. Dr. Joubert observed that Mr. Abell associated chest pain with his lack of a cane. *Id.* at 242. An EKG, no added salt, and no heavy lifting or activity were ordered, with follow up in two days if his condition worsened. *Id.* at 243.

On June 27, 2013, Mr. Abell was admitted to the infirmary by Dr. Joubert complaining of left sided chest pain and shortness of breath. *Id.* at 244. Dr. Joubert noted that Mr. Abell had significant coronary artery disease history and a positive stress test in November 2012. *Id.* On assessment, Dr. Joubert noted that Mr. Abell was in no apparent distress with regular heart rate and rhythm and that the abnormal systolic murmur noted the day before was absent. *Id.* Mr. Abell was placed on oxygen and Dr. Joubert made a note to discuss the case with Dr. Garcia, the Wexford cardiologist. *Id.* at 245. Dr. Joubert ordered an immediate EKG and lab work and requested a cardiology evaluation. *Id.* at 249.

On June 28, 2013, Dr. Ottey found Mr. Abell in no apparent distress, with regular heart rhythm and no murmurs, gallops, masses, or swelling. *Id.* at 254. Mr. Abell refused various medications the following day. *Id.* at 258-264. Mr. Abell was seen again by Dr. Ottey on the morning of June 30, 2013, and had no chest pain or shortness of breath. *Id.* at 268. He reported heartburn after taking medication and his Prilosec prescription was increased. Mr. Abell was seen by Dr. Espina on July 1, 2013, and ordered to be discharged from the infirmary with follow up at the clinic. *Id.* at 274-75.

On July 3, 2013, Mr. Abell reported to Mr. Flury that he continued to have intermittent episodes of chest pain, but would not take his prescribed medication. *Id.* at 276.

It was noted that Mr. Abell's case was discussed during a provider care conference in relation to the cardiology follow up, with the Medical Director stating that Mr. Abell should continue to be managed on site and should be encouraged to take his medication.  *Id.*

Mr. Abell was reevaluated by Dr. Summerfield on September 12, 2013.  *Id.* at 280.  His left eye vision had decreased to 20/400.  *Id.*  Dr. Summerfield recommended cataract surgery, and a consultation was approved for cataract surgery in November of 2013.  *Id.* at 281.  Mr. Abell was seen on October 28, 2013, for a preoperative history and physical.  *Id.* at 282-83.  On November 7, 2013, a consult request for coronary evaluation was placed due to possible interactions with the anesthesia in the cataract surgery.  *Id.* at 284.  The record does not reflect whether cataract surgery has been performed.  *Id.*

II.     Analysis

    A.     Standard of Review

Defendants' motions are styled as motions to dismiss under Rule 12(b)(6)[10] or, in the alternative, for summary judgment under Rule 56.[11]  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

        1.     Rule 12(d) Conversion

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(d), the Court, in its discretion, may consider matters outside of the pleadings; if the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the

---

[10] Fed. R. Civ. Pro. 12(b)(6).

[11] Fed. R. Civ. Pro. 56.

material that is pertinent to the motion." Fed. R. Civ. P. 12(d). [12]  When the movant expressly

captions its motion "in the alternative" as one for summary judgment, and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice that

conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties

of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).  In

accordance with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), Mr. Abell was

informed of his right to file a response to the Motions, and the opportunity to submit affidavits,

declarations, and other documentary evidence. *See* ECF No. 16.  As noted, he has not filed a

response.

Ordinarily, summary judgment is inappropriate "where the parties have not had an

opportunity for reasonable discovery." *E.I. Du Pont de Nemours and Co. v. Kolon Industries,

Inc.,* 637 F.3d 435, 448 (4th Cir. 2011).  However, "the party opposing summary judgment

'cannot complain that summary judgment was granted without discovery unless that party has

made an attempt to oppose the motion on the grounds that more time was needed for

discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)

(*quoting Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  Generally,

to raise adequately the issue that discovery is needed, the party opposing the motion must file an

affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for

specified reasons, it cannot present facts essential to justify its opposition," without needed

discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit

---

[12] A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, Federal Practice and Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

requirement of former Rule 56(f)).  Mr. Abell has not filed an affidavit under Rule 56(d).  It is

therefore appropriate to address Defendants' motions as motions for summary judgment.

>        2.        Legal Standard for Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a);[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In considering the

motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and

draw all reasonable inferences in [its] favor."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290

F.3d 639, 645 (4th Cir. 2002).  Because Mr. Abell is self-represented, his submissions are

liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The Court must, however,

also abide by the affirmative obligation of the trial judge to prevent factually unsupported claims

and defenses from proceeding to trial.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d

514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

>   B.        Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue

of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized

by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th

---

[13] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment."  Fed. R. Civ. P. 56 advisory committee's note.

Cir. 2003) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  To state an Eighth Amendment claim for denial of medical care, a prisoner must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, prison staff were aware of the need for medical attention, but failed to either provide it or ensure the needed care was available.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (*quoting Farmer*, 511 U.S. at 844).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted."  *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2011);

17

(*citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Assuming that Mr. Abell, a diabetic who has undergone bypass surgery and is prescribed medications, including nitroglycerin for chest pain, has serious medical conditions, it does not appear that any of the individuals named in the Complaint have exhibited "subjective recklessness" in the face of Mr. Abell's medical complaints.[14] *Farmer*, 511 U.S. at 839 at 40.

### 1.    Ms. Baucom's Motion

Correctional Defendant, Ms. Sharon Baucom, M.D., has submitted an uncontroverted affidavit indicating that she does not provide medical care to prisoners in her role as Director of Clinical Services for DPSCS. *See* ECF No. 15-3.  Ms. Baucom was not aware of Mr. Abell's complaints and was not involved in his care or treatment. *See id.* at 1.  There is no evidence supporting a claim against Ms. Baucom.  Accordingly, Ms. Baucom's motion, construed as summary judgment, will be granted.

### 2.    Medical Defendants' Motion

#### i.    Wexford

Mr. Abell has named Wexford as a party to this action, presumably under the theory of vicarious liability known as respondeat superior.  Respondeat superior liability does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (same).  Thus, Wexford is entitled to summary judgment.

---

[14] "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).

ii.   Remaining Medical Defendants

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 102.  As noted above, when contractual prison health care providers show "deliberate indifference" to a prisoner's "serious medical needs," their actions or inactions may amount to an Eighth Amendment violation.  *Id.* at 104.  The health care providers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference."  *See Farmer*, 511 U.S. at 837.  A health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms.  *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).

Furthermore, the medical treatment provided "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," and a defendant must know of and disregard an excessive risk to inmate health or safety.  *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds*, *Farmer*, 511 U.S. at 837.

Mere negligence or malpractice does not give rise to a constitutional claim.[15]  *See Miltier*, 896 F.2d at 848; *see also Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (*quoting Farmer*, 511 U.S. at 835).  Furthermore, a prisoner's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment claim.  *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

---

[15] To the extent Mr. Abell seeks recovery based on medical negligence or medical malpractice, the Court declines to accept supplemental jurisdiction over such claims and makes no findings with regard to the care provided by any medical personnel involved in Mr. Abell's care. *See* 28 U.S.C. § 1367(c)(2012).

The record clearly demonstrates that Mr. Abell received prompt, diligent, and appropriate medical care for his many ailments, and that cataract surgery was scheduled when his vision deteriorated. *See generally* ECF No. 17-4. Nothing more is constitutionally required.

III.    Conclusion

For the reasons stated above, the motions to dismiss or, in the alternative, for summary judgment, will be construed as motions for summary judgment, and will be granted.

9/8/14
Date

William D. Quarles, Jr.
United States District Judge